OPINION
This appeal emanates from a final judgment of the Lake County Court of Common Pleas. Appellants, Arthur Sidley, Walters Custom Builders, and Waterford Products Co., seek the reversal of the court's decision granting summary judgment in favor of appellees, Ralph Victor, Ralph Victor Construction, Inc., Ralph Victor Construction Co., Ralph Victor Co., Ralph Victor d.b.a. Quail Hollow Development Co., Quail Hollow Development, Inc., Quail Developers, Inc., Quail Hollow Development Corp., Quail Hollow Development Co., Club Corporation of America, Club Corp Realty, and George Blonsky, Jr. For the following reasons, we affirm that judgment in most respects.
The subject matter of this action concerns certain real estate contracts under which appellants purchased specific sublots in a development with the intent to build custom homes. After appellants had started to build some of the homes, a dispute developed over whether appellants were complying with certain setback requirements. When the dispute could not be settled, appellants initiated this action against appellees, primarily alleging that they had fraudulently concealed the existence of other minimum building standards.
At all times relevant to this litigation, appellant Waterford Products was engaged in the business of buying and selling real estate. Appellant Arthur Sidley ("Sidley") was the president and controlling shareholder of Waterford Products, which, in turn, was a one-third partner in appellant Walters Custom Builders. As part of its business relationship, appellant Waterford Products acted in a representative capacity on behalf of the Walters Custom Builders partnership.
The sublots at issue in this action are located in an upscale residential development known as the Hunt Club at Quail Hollow Subdivision in Concord Township, Lake County. Appellants purchased the lots from Ralph Victor Construction, Inc., which had earlier bought the sublots from Quail Hollow Development, Inc.
Appellants desired to become one of five authorized custom-home builders in the Hunt Club development. In 1990, when appellants were negotiating for the purchase of the first sublots, appellants were made aware of the existence of certain deed restrictions created by Quail Hollow Development, Inc., called the Quail Hollow Conditions, Covenants and Restrictions ("CCRs").[1] These CCRs mandated that any construction in the Hunt Club had to comport with certain privately imposed "minimum building standards" which were supposedly on file with the developer of the Hunt Club, Ralph Victor Construction, Inc.
Independent of the minimum building standards, the CCRs also expressly referred to specific requirements governing the amount of area a home had to be "setback" from the property lines. These requirements were also delineated in the recorded deeds to the sublots.
In regard to the minimum building standards, appellant Sidley asserted at the trial level that when he asked the President of Ralph Victor Construction, Inc., Ralph Victor ("Victor") for a copy of the standards, he was told that no such standards existed at that time and that the various builders in the Hunt Club were collectively drafting them as the development progressed. This fact was disputed below as Victor alleged that he and his company did not conceal, fraudulently or otherwise, the standards from Sidley.
As part of his deposition, Sidley stated that he would not have agreed to purchase the sublots, had he seen the cumbersome construction specifications set forth in the minimum building standards when he was negotiating the contracts with Victor. Sidley did not deny that he was aware of the reference in the CCRs to such standards or that Ralph Victor Construction, Inc. was supposed to have possession of them. Rather, his claim was that Victor told him they did not yet exist.
Despite Sidley's admitted awareness that the standards would, at some point, come into existence, appellants purchased the first five sublots and began constructing homes, including a model home. The sublots were located in Quail Hollow Subdivision No. 1. In 1992, appellants contracted to buy four sublots in Phase III of the Quail Hollow Subdivision No. 3. A month later, appellants contracted to purchase existing and future sublots within Quail Hollow/Hunt Club Subdivision-Phase III.
Victor and the vice-president of Quail Hollow Development, Inc., appellee George Blonsky, Jr. ("Blonsky") approved appellants' construction and design plans with little or no alterations. Despite this, appellants began to experience problems with the other homeowners in the Hunt Club development.[2] Apparently, the other residents believed that at least two of appellants' homes failed to comport with the minimum building standards referenced by the CCRs, and that these deviations would cause their property values to decline. The residents were also disturbed that appellants' plans had received formal approval from Ralph Victor Construction, Inc. and Quail Hollow Development, Inc. despite the residents' voiced concerns that the designs did not meet the minimum building standards.
In regard to one of the contested projects, eleven Hunt Club residents sent a letter to Victor in March 1992 complaining that appellants' design of the proposed Kren home failed to comport with the minimum building standards and that the approval process had been flawed. As a result, one of the partners of appellant Walters Custom Homes met with Victor and voluntarily revised the front elevation of the home in an attempt to satisfy the minimum building standards and appease the residents. These changes cost appellants $2,000.
According to Sidley, it was within this same general time frame that he first was told that the minimum building standards were not merely proposed requirements which would be developed at a latter time, but were actual requirements which had existed for approximately two years. In his deposition, Sidley asserted that, on April 28, 1992, he had a meeting with Victor and his attorney for the purpose of executing the final purchase agreement for the sublots. Near the conclusion of this meeting, Sidley stated that he was uncomfortable with going forward with the projects when he did not know what the standards would eventually be. Under Sidley's version of the conversation, Victor's attorney responded that the standards had already been developed.
However, in another portion of his deposition, Sidley testified that, in March 1992, he had been specifically told by one of his partners that the other residents of the Hunt Club had objected to the Kren home on the basis that it did not met certain requirements of the minimum building standards. This testimony appears to contradict Sidley's own assertion that the standards were not revealed to him until after he had signed the final purchase agreement in April 1992.
As to the other contested home, the Wade residence, appellants experienced greater difficulties than had occurred in relation to the Kren home. Appellants had engaged the services of a professional surveyor to prepare site drawings of the Wade home prior to construction. This surveyor had been used for numerous houses in the development. Apparently, the surveyor found no setback violations with either the public or private requirements. The findings and the plan for the Wade home were thereafter submitted to Ralph Victor Construction, Inc. and Quail Hollow Development, Inc. for approval. After some slight modification of the design of the Wade home, appellants received formal approval for the Wade design and construction plans on April 28, 1992, the same day upon which, according to Sidley, he was first informed of the existence of the minimum building standards referenced by the CCRs.
Construction on the Wade home commenced in early May 1992. Residents of the Hunt Club, however, objected to the design of the house on the grounds that it did not comport with the minimum building standards. They also objected to the siting of the house. Shortly after construction commenced, the residents informed appellants and the Wades that the siting of the house also violated the rear and side setback requirements enumerated in the CCRs.[3] Nevertheless, appellants continued construction, and the residents filed an injunction action in the Lake County Court Common Pleas against, inter alia, appellants.
The injunction action was based upon the sole grounds that the siting of the Wade home violated the rear and side setback requirements set out in the CCRs. The residents did not raise any issue in the injunction pleading regarding their concerns about the design of the Wade home or any alleged violation of the minimum building standards. A permanent injunction was granted in June 1992 on the basis that the siting of the Wade home violated the rear and side setback requirements.[4] This court affirmed the granting of the injunction on appeal.
At that point, appellants were left with the half-finished Wade house and a court order prohibiting any further construction. On June 25, 1992, after the permanent injunction had been granted, appellants claim that they made their first attempt to obtain a variance of the setback requirement from Ralph Victor Construction, Inc. and Quail Hollow Development, Inc.[5] No variance was either granted or denied at this particular time; rather, the two appellees stated they never acted upon the matter because they did not view appellants' actions to be a formal request for a variance.
Other negotiations took place in an effort to resolve the situation; however, no other solution was ever implemented. A few months after the permanent injunction was granted, the Wades gave appellants notice of their intent to rescind their contract and then filed suit against appellant Waterford Products Co. In November 1993, appellants submitted a formal request to both Ralph Victor Construction, Inc. and Quail Hollow Development, Inc. for a variance from the CCR setback requirements for the Wade house. This request was granted a few months later.
By this time, though, the Wades were no longer interested in building the proposed home. The Wades eventually settled their lawsuit against appellant Waterford Products Co. Believing that their reputation was irreparably damaged, appellants eventually sold the model home and did not exercise their option to purchase any additional sublots.
Appellants thereafter instituted suit against appellees and the professional surveyors in a six-count amended complaint. Appellants alleged that all of the above-mentioned appellees, except the surveyors, had been the master developers of the Hunt Club.[6] Appellants further alleged that Victor had acted at all relevant times in his individual capacity and/or in his capacity as an agent for all of the appellees.
Counts I, III, IV and V of the complaint were based on a theory that appellees: (1) fraudulently concealed the existence of the minimum building standards referenced in the CCRs from appellants in an attempt to induce them to purchase sublots in the Hunt Club; (2) negligently and recklessly approved appellants' plans for the Wade and Kren houses submitted by appellants when appellees knew that the plans were not in conformance with the concealed standards; (3) wrongfully failed to grant a variance for the Wade sublot which would have prevented the residents' pursuit of injunctive relief; and (4) defamed appellants' reputation.
The counts alleged that, as a result of the damage to their reputation, appellants were economically unable to develop at least six sublots previously purchased or which were under contract in the Quail Hollow/Hunt Club Development. The complaint also alleged that as a result of the failure to grant the requested variance on the Wade home, appellants had been precluded from exercising its option to purchase six additional sublots in the Quail Hollow/Hunt Club Subdivision Phase III.[7] Based upon this, appellants alleged that they lost $60,000 in profit on each of these sublots.
Count II charged the professional surveyors with negligently surveying, siting, and/or preparing the site drawings for the Wade residence. Count VI sought relief for expenses incurred as a result of appellants' litigation with the Wades.
Appellees ultimately moved for summary judgment in three separate motions.[8] After appellants had responded to each, the trial court granted summary judgment on all claims in favor of appellees. The trial court also found that there was no just cause for delay under Civ.R. 54(B). Thus, the only remaining claim was appellants' claim against the professional surveyors, which was later stayed pending appellants' appeal of the grant of summary judgment in favor of appellees.
In their timely appeal, appellants has asserted three assignments of error for our consideration:
 "[1.] THE TRIAL COURT ERRED IN CONCLUDING THAT APPELLEE RALPH VICTOR'S MISREPRESENTATIONS COULD NOT BE THE PROXIMATE CAUSE OF THE APPELLANT'S DAMAGES.
 "[2.] THE TRIAL COURT ERRED IN CONCLUDING THAT THE EXCULPATORY CLAUSE IN THE SUBLOT PURCHASE AGREEMENT RELIEVED THE APPELLEES OF ANY DUTY OWED TO THE APPELLANT.
 "[3.] THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT CONTRARY TO LAW."
Initially, we note that summary judgment is proper when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in his favor. Harless v. WillisDay Warehousing Co. (1978), 54 Ohio St.2d 64, 66; Civ.R. 56(C). An appellate court will apply this same standard to both the factual and legal issues in its review. See Temple v. WeanUnited, Inc. (1977), 50 Ohio St.2d 317, 327-328.
As appellants' first and third assignments of error are interrelated, we will address them in a consolidated fashion. Under these assignments, appellants argue that the trial court improperly granted summary judgment in favor of appellees on the grounds that appellants failed to show that their damages and claims of lost profits were proximately caused by the alleged fraudulent concealment of the minimum building standards. We disagree with appellants' theory on this matter.
In the case at bar, our review of the appealed judgment indicates that the trial court did not discount appellants' claims that Victor had fraudulently concealed the minimum building standards in an attempt to induce appellants to purchase sublots in the Hunt Club. Instead, the court essentially determined thateven if the allegations were true, appellants failed to establish that their alleged damages flowed directly from, or were proximately caused by, the concealment.
In order for appellants to prevail on their fraudulent concealment claim, they were required to demonstrate, inter alia, that their alleged damages were proximately caused by the fraudulent concealment. See, e.g., Finomore v. Epstein (1984),18 Ohio App.3d 88. Stated differently, appellants had to establish that their reliance upon appellees' alleged assertion as to the nonexistence of the minimum building standards proximately resulted in an injury to them. Mueller v. Estate of Seiwert (Aug. 21, 1998), Hamilton App. No. C-970783, unreported, 1998 Ohio App. LEXIS 3809.
Although the issue of proximate cause is generally a question of fact, it becomes a question of law where the facts are undisputed or when the facts, viewed in a light most favorable to the non-moving party in a summary judgment exercise, are such that a reasonable person could not infer that the defendant's actions were the cause of the plaintiff's injuries. Fowler v. WilliamsCty. Commrs. (1996), 113 Ohio App.3d 760, 776; Reed v. Weber
(1992), 83 Ohio App.3d 437, 443.
Both below and on appeal, appellants have maintained that they met their burden in establishing the requisite causal link though Sidley's deposition testimony. As was noted above, Sidley stated that he would never have agreed to purchase the sublots in the Hunt Club if Victor had revealed the existence of the minimum building standards. Thus, according to appellants, none of their ensuing problems would never have arisen because they would have not participated as a builder in the development.
In regard to the foregoing argument, we would begin our analysis by noting that the existence of fraud generally renders a contract unenforceable because there was no meeting of the minds at the moment of the formation of the agreement. McCarthy v.Robinson (Dec. 1, 1994), Franklin App. No. 94APE05-619, unreported, 1994 Ohio App. LEXIS 5348. Hence, the usual remedy for fraud in the inducement is the rescission of the contract. However, if the existence of the fraudulent behavior is not discovered until after the parties have began to perform the contract, the defrauded party has the right to choose the nature of his remedy; i.e., he can either seek to rescind the agreement or retain the benefits of the contract and seek damages for any resulting harm. Walter v. Marion Production Credit Assn. (1987),42 Ohio App.3d 215, 218; Canty v. Vandegrift (Mar. 23, 1993), Franklin App. No. 92AP-1317, unreported, 1993 Ohio App. LEXIS 1723.
In this action, appellants did not seek to have the purchase agreements rescinded and recover the purchase price for the sublots. Instead, appellants sought to recover the ultimate benefit of their bargain: i.e., the consequential damages covering all of the profits they could have made if they had been able to build and sell each of the planned homes. Although it is irrelevant for purposes of our analysis, we would assume that appellants made this choice because they would be able to recover the purchase prices of the land itself by reselling the sublots.
Nevertheless, despite their clear choice of remedy, appellants' evidentiary materials only supported the ultimate relief of rescission. Again, we would emphasize that the crux of Sidley's testimony was that if he had known of the minimum building standards when the purchase agreements were negotiated, he never would have consummated the deal. Even if we assume that Sidley's testimony were admissible under the Ohio Rules of Evidence,[9]
that testimony did not tend to show that the alleged fraud was the reason why appellants did not finish the project.
As to this point, it should be noted that the mere fact that the timely disclosure of the minimum building standards would have stopped appellants from executing the deal does not mean that it was the cause of the ultimate failure of the project. That is, the mere fact that there was no "meeting of the minds" when the parties first entered into the deal does not mean that appellants could not have finished the entire project and still made a profit. Instead, a finding of proximate cause will turn upon whether it can be said that, but for the concealment of the minimum building standards, appellant could not go forward with the construction of the planned homes.
Upon reviewing the evidentiary materials submitted by the parties, we conclude that it was undisputed that appellants were unable to complete the proposed homes solely because the judgment against them in the injunction action harmed their reputation with prospective buyers. Furthermore, the various legal documents in the record pertaining to the injunction reveal that the residents sought the injunction on the sole grounds that the siting of the Wade house violated the rear and side setback requirements contained in the CCRs. In turn, there is no dispute that, unlike the minimum building standards, the setbacks were specifically set out in the CCRs. Similarly, there is no dispute that appellants were aware of the existence of the CCRs, and that the CCRs were also recorded as deed restrictions and were available for any prospective purchaser to view.
As part of his deposition testimony, Sidley indicated that it was his belief that the residents' injunction action had been motivated in part upon appellant's failure to abide by the minimum building standards. As to this point, this court would emphasize that the residents' underlying motivation is irrelevant to the proximate cause issue. Since the granting of the injunction was predicated solely upon the setback violation, it cannot be said that any violation of the concealed standards caused the project to fail. At best, the violations of the concealed standards were a tangential problem which, as will be discussed below, may have decreased the amount of profits appellants could have made. Thus, Sidley's statement concerning the residents' motivation did not create a factual dispute on the proximate cause issue.
In their appellate brief, appellants contend that the setback problem should not be viewed as an intervening act which will relieve appellees of any liability for the alleged fraud. As to this contention, we would simply indicate that, pursuant to the foregoing analysis, we do not consider the setback problem to have been an intervening cause of the project's failure; instead, it was the sole cause. Again, we determine that appellants did not submit any evidentiary materials demonstrating that their entire project would have still failed even if the setback problem had not developed. Under such circumstances, the alleged fraud was not a proximate cause of appellants' consequential damages.
As an aside, it should be noted that, if appellants had been able to build all of the proposed homes, they may been entitled to recover the additional costs incurred in redesigning their homes to comply with the minimum building standards. For example, as to the Kren home, there were some evidentiary materials presented which showed that appellants had to expend $2,000 to correct certain violations of the standards. If appellants could prove the other elements of fraudulent concealment, they might have been entitled to recover similar damages in relation to the remaining proposed homes.
However, given that appellants never built the remaining proposed homes, they never incurred any additional expenses in complying with the concealed standards. As a result, appellants will never be able to recover any type of damages for additional costs incurred in relation to the sublots upon which no homes were built.
As to the Kren home, our review of appellants' responses to the summary judgment motions shows that, although they referred to the fact that they had incurred the extra expense in completing this house, they never asserted a separate argument in regard to that specific point. Similarly, appellants' brief before us does not assert a separate argument regarding the additional expenses for the Kren home.
Nevertheless, we are constrained to note that the amended complaint did contain a specific allegation under its fraudulent concealment claim that they had incurred some additional expenses in correcting the problems with the Kren home. Pursuant to the foregoing analysis, appellants would be entitled, as part of their fraudulent concealment claim, to recover the additional expense incurred as to the Kren home. Thus, even though this aspect of the fraudulent concealment claim was not artfully stated, we conclude that it was properly before the trial court.
Furthermore, the evidentiary materials before the trial court indisputably showed that the incurrence of the additional $2,000 expense on the Kren house was proximately caused by appellants' need to satisfy the minimum building standards. Accordingly, as appellees were not entitled to summary judgment on that specific point, this court holds that the trial court should have allowed appellants to proceed on its fraudulent concealment claim, but only as it related to the "Kren" expenses.
In summation, to the extent that appellants sought to recover their lost profits as to all of the subject sublots except the Kren sublot, this court concludes that the trial court did not err in granting summary judgment in favor of appellees on the fraudulent concealment claim because the undisputed evidence showed that the alleged fraud was not the proximate cause of the project's failure. In regard to the Kren sublot, we hold that the granting of summary judgment was erroneous because the evidentiary materials supported the finding that the alleged concealment of the minimum building standards had been the proximate cause of appellants' incurrence of an additional $2,000 expenses to complete the home. To this limited extent, appellants' first and third assignments of error have merit.
In the second assignment of error, appellants argue that the trial court improperly granted summary judgment on their claims that appellees negligently and recklessly approved plans submitted by appellants when appellees knew that the plans were not in conformance with the concealed standards. On this issue, the trial court ruled that the CCRs contained an exculpatory clause that relieved appellees of liability for any duty to withhold approval of the plans on the basis that the plans did not comport with the minimum building standards.
The clause at issue is contained within Article III, Section 3.8 of the CCRs:
 "Failure of Developer [Ralph Victor Construction, Inc.] to enforce any of the restrictions contained herein, shall in no event be construed to be in any manner a waiver of, acquiescence in, or consent to a further or succeeding violation of these restrictions. However, the failure, refusal or neglect of Developer to enforce said restrictions or to prevent violations thereof shall in no event make Developer liable for such failure, refusal or neglect."
On appeal, appellants argue that the clause is unenforceable because: (1) the parties are of unequal bargaining position with appellants being the disadvantaged party; (2) appellants were misled as to the basis of the bargain by virtue of the fraudulent concealment of the minimum building standards; (3) the clause unfairly shifts the risks of appellees' erroneous approval onto the party who is in the worst position to bear the burden; and finally (4) the doctrine of equitable estoppel precludes the application of the exculpatory clause when a party has been unfairly induced to change his position.
We determine that appellants have waived the right to argue these theories on appeal. The issue of the exculpatory clause was first raised by appellee Ralph Victor Construction, Inc. in its motion for summary judgment. Appellee Ralph Victor Construction, Inc., called the exculpatory provision to the attention of both the appellants and the trial court. Appellee Ralph Victor Construction Inc., argued that the clause operated to remove the existence of any legal duty to exercise reasonable care in approving appellants' submitted plans.
Appellants offered no evidentiary materials of the type enumerated in Civ.R. 56(E) or other materials setting forth facts that would suggest that the exculpatory clause was invalid or inapplicable for the reasons now alleged in their appellate brief. Thus, none of these theories in defense were raised or brought to the attention of the trial court during the summary judgment exercise.
A party moving for summary judgment bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the non-moving party's claims, and that the moving party is entitled to judgment as a matter of law. Dresher v. Burt
(1996), 75 Ohio St.3d 280, 293. Once the moving party meets this burden, the non-moving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial. Id. If the non-movant does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party. Id.
Here, appellants had a duty to respond to the summary judgment motion in accordance with Civ.R. 56(E) by setting forth the specific facts demonstrating the existence of a genuine issue with regard to their theories as to why the exculpatory clause was unconscionable. They did not do so. Accordingly, as the clause on its face would indeed operate to preclude liability on appellees' part for its handling of the approval process, summary judgment was properly rendered in this regard. Even if there were no waiver, this court fails to view this clause as unconscionable per se. This was not a David and Goliath consumer type transaction. None of the facts alleged make this series of transactions anything other than arm's length transactions, conducted without duress. Appellants' second assignment of error is without merit.
Consistent with the foregoing analysis, the judgment of the trial court is reversed in regard to appellants' claim of fraudulent concealment. Upon remand, the trial court shall allow appellants to go forward on that claim to the extent that if they can prove fraudulent concealment they may be entitled to recover damages for the additional $2,000 expenses they incurred on the Kren sublot. In all other respects, including appellants' request for lost profits under their claim of fraudulent concealment, the judgment of the trial court is affirmed.
NADER, J., O'NEILL, J., concur.
[1] The CCRs in question were privately imposed deed restrictions and were not necessarily representative of the public standards for either Concord Township or Lake County.
[2] According to the contract of sale between Quail Hollow Development, Inc. and Ralph Victor Construction, Inc., the two entities shared equally the power to review and approve construction plans for the Hunt Club development.
[3] Again, these setback requirements were specifically set out in the CCRs and the deeds, separate and apart from any reference to the minimum building standards.
[4] Although Sidley's deposition testimony is not entirely clear as to when the following occurred, it appears that appellants submitted new, revised plans for the Wade home which made changes to conform to the minimum building standards, all in an effort to appease the residents. These proposed changes did not impact the setback problem. According to Sidley's answers to interrogatories, putting these changes into effect would have resulted in a loss of $20,000 to appellants if they had proceeded with construction.
[5] Again, it would appear that no public variance was needed or sought.
[6] The record before this court does not expressly indicate how the various appellees were related and what specific role they played in regard to the Quail Hollow Subdivision.
[7] We note that this last agreement to exercise an option to purchase lots in the future was executed after Sidley had, according to him, become aware that minimum building standards existed. Thus, appellants argue that the failure to grant the variance on the Wade house was the cause of their lost profits for this contract, rather than the alleged fraudulent concealment of the minimum building standards.
[8] Ralph Victor Construction, Inc. filed one motion; Quail Hollow Development, Inc. filed another motion; and, the remaining appellees filed the third motion.
[9] Arguably, Sidley's testimony was simply a speculative opinion on his part that would not fall within the realm of acceptable lay opinion pursuant to Evid.R. 701. Indeed, Sidley admitted that he knew minimum building standards would be developed and that he did not know what the standards would ultimately provide. Nevertheless, we do not need to decide this point in order to resolve the instant appeal.